**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| **PHILIP ROGERS,** | |
|      Plaintiff, | |
| v. | Civil Action No. <u>1:23-cv-1383</u> |
| **ROBERT BROWN,**<br>SERVE**:** 1345 Highland Lake Drive<br>Lawrenceville, Georgia 30045, | |
| **IFLYAJET, INC.,**<br>SERVE: Robert Brown, Registered Agent<br>510 Briscoe Blvd.<br>Lawrenceville, Georgia 30046, | |
|      Defendants. | |

## **COMPLAINT**

Philip Rogers ("**Rogers**" or "**Plaintiff**"), by and through the undersigned counsel, respectfully file this Complaint against Defendants, Robert Brown ("**Brown**") and IFLYAJET, Inc. ("**IFLYAJET**") (collectively, "**Defendants**"), and in support thereof state as follows:

### **INTRODUCTION**

1.      Brown is the sole owner and manager of IFLYAJET, which holds itself out to the public and unsuspecting buyers as "a complete turnkey management solution for aircraft owners looking for affordable, personal, and accountable aircraft management."[1]  Brown also represents to unsuspecting buyers, like Phil Rogers, that there are "no long-term contracts to tie you down."

---

[1] *See* https://iflyajet.com/aircraft-management.

Brown's representations concerning IFLYAJET are false and fraudulent and intended to merely cover-up the fact that IFLYAJET is nothing more than a wide-ranging illegal charter operation.

2.      Brown, through his company IFLYAJET, operates and manages the jets. Occasionally, Brown permits the owners of each jet the use of their aircraft, however, Brown primarily offers each jet to non-owners for illegal charters, without the owners' knowledge. Rogers is one of those owners.  Through Brown's fraud, he converts the shares of these jet owners to his own use, while the owners are expected to foot the bill and subsidize Brown's illegal charter operation.

3.      In 2021, Brown induced Rogers into purchasing a share of a Gulfstream G-IV, with the expectation that Rogers would be able to use the aircraft proportional with the ownership stake. Brown was already operating his illegal charter enterprise at the time and continued its operation with the illegal use of the latest airplane addition.  Rogers learned of the fraud perpetrated on him in December 2022 when, pursuant to a books and records demand made by Optical Air Data Systems, LLC ("**OADS**"), IFLYAJET produced numerous timeshare agreements that were previously concealed from OADS and Rogers.  Further, Rogers also learned that Brown was applying Rogers' signature to corporate documents, contracts, and documents filed with the Federal Aviation Administration ("**FAA**") without Rogers' permission or knowledge.  Rogers, a pilot, cannot risk losing his license by being a party to fraud before the FAA.  Accordingly, Rogers requests this Court's intervention to hold Brown accountable for the fraud he has committed and to make Rogers whole.

**PARTIES**

4.      Plaintiff is an individual who permanently resides in Wyoming, but who owns a home in Fauquier County, Virginia, and is a licensed pilot. Rogers is also part-owner of a business with its principal place of business in Manassas, Virginia. At all times relevant to the claims

identified herein, Plaintiff was residing at his home in Manassas, Virginia.

5.      Robert Brown is an individual residing in Georgia and the sole owner of IFLYAJET, Inc.

6.      IFLYAJET is a Georgia corporation engaged in the ownership, purchase, sale, and management of corporate airplanes.

## JURISDICTION AND VENUE

7.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000.00, as detailed herein, and the parties are citizens of different states.

8.      Personal jurisdiction exists over the Defendants as they:  (i) regularly transact business in the Commonwealth of Virginia; and (ii) caused tortious injury in the Commonwealth by an act or omission outside the Commonwealth.

9.      Defendants regularly charter flights out of Manassas, Virginia for Rogers, his wife Alisa, and his companies, including OADS.  Defendants have chartered jets out of Manassas for Rogers since at least 2020.  Further, Brown visited the OADS facility in Manassas, Virginia to participate in test and demonstration flights, as well as to assist in the purchase of an aircraft.

10.     Specific to this claim, Brown reached out to Rogers beginning in January 2021, knowing Rogers resided in Manassas, Virginia and worked out of Manassas, Virginia.  Brown sent information to Rogers, in Manassas, Virginia, related to the aircraft including pictures, contracts, and maintenance records. Further, Brown brought the N250KC to Manassas to provide test flights to Rogers out of the Manassas airport, all to solicit Rogers' purchase of the aircraft and to induce Rogers to place the N250KC and potentially other planes under management with Brown's company.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) as the

acts or omissions giving rise to the claims occurred in this district.

**STATEMENT OF FACTS**

I.      **Brown's Fraudulent Offer**

12.      Beginning in or around September 2020, and continuing for several years, Brown provided Rogers, and his wife, with certain aviation services, mainly chartering flights for Rogers into and out of Manassas, Virginia.  These services were provided by Brown to Mr. and Mrs. Rogers in Manassas, Virginia.

13.      On January 3, 2021, Brown texted Rogers concerning an opportunity for Rogers, either individually or through an affiliated entity, to purchase a share of a Gulfstream G-IV, FAA Registration N250KC and bearing serial number 1025 (the "**N250KC**").  A copy of the text message is attached as **Exhibit A**.

14.      Through the January 3, 2021 communications, Brown expressly indicated that the N250KC could fit in the hangar in Manassas, Virginia used by Plaintiff and his wife, for their individual and corporate flight activities.

15.      Brown proposed Rogers and his wife would purchase a one-quarter interest in the N250KC and only be responsible for their proportional share of maintenance and usage expenses.

16.      Rogers would be entitled to all the benefits of a one-quarter share of the N250KC, including a proportional use of the aircraft.

17.      Little did Rogers know, but Brown planned to place the N250KC into his "fleet" of airplanes for a wide-ranging illegal charter enterprise – a material fact that was never disclosed to Rogers.  Brown never intended for Rogers to have a proportional share of the N250KC, as Brown never intended the N250KC's use to be limited to the owners of that aircraft.  Unbeknownst to Rogers, Brown's plan would drag Rogers into the Brown's illegal charter operation, cost Rogers hundreds of thousands of dollars, and put Rogers' pilot license at risk.

18.     Brown's business, IFLYAJET, was formed in 2000.  Its business model is to take ownership stakes in, or management duties for, numerous private planes, and allowing the owners of the various planes to book flights on any plane managed or owned by IFLYAJET.  Booking requests would go directly to IFLYAJET and IFLYAJET would shuffle their planes around to accommodate the booking requests.  When IFLYAJET booked passengers on planes other than the one the passenger owned, IFLYAJET would hastily document the flight through a Timesharing Agreement.  The broad, repetitive use of multiple Timesharing Agreements, and the offering of air transportation as a proxy for charter flights, constitutes an illegal charter scheme in violation of federal aviation laws and regulations.  Brown was operating this scheme at the time he proposed Rogers purchase a share of the N250KC, failed to disclose same to Rogers, and, intended to, and in fact did, use the N250KC as part of the scheme.

19.     The purchase of Rogers' share of the N250KC was completed in or around January 2021, with Rogers ultimately purchasing the quarter-share of the N250KC through his company, OADS.  The purchase was made in reliance on Brown's express representations of the way the shared ownership arrangement would work.  Some of those representations were even memorialized in the January 2021 Shared Ownership Agreement of the Owners of N250KC, including that:

- The purpose of the Shared Ownership Agreement was to "engage in any lawful activity ancillary" to the ownership of the N250KC.

- A Member was entitled to use the N250KC in an amount consistent with its percentage interest in the N250KC.

- Any lease or other disposition of the N250KC could only occur with unanimous consent of the Members.

A copy of the January 2021 Shared Ownership Agreement of the Owners of N250KC is attached as **Exhibit B**.

- 5 -

20.     Rogers, through his affiliated entity, purchased a share of the N250KC and entered into the Shared Ownership Agreement in good faith, and in reliance on both Brown's express representations concerning the operation and management of the N250KC and also in reliance on Brown to act in good faith.  Brown's representations were false at the time they were made.

21.     In or around July 2021, the parties executed several additional agreements, which agreements modified and superseded the January 2021 Shared Ownership Agreement.  The amended agreements, which also changed the membership structure of the joint owners, included a Joint Ownership Agreement of the Owners of N250KC (the **"Ownership Agreement"**) and an Aircraft Management Agreement (the **"Management Agreement"** and, collectively with the Ownership Agreement, the **"N250KC Agreements"**).  Copies of the Ownership Agreement and Management Agreement are attached as **Exhibits C and D**, respectively.

22.     Contrary to Brown's express representations prior to Rogers' purchase of the N250KC (through OADS), over the next two years of ownership, Rogers would be permitted to use the N250KC sparingly as Brown consistently, and illegally, chartered the plane out to non-owners for their use in violation of federal aviation laws and regulations and concealed this activity from the other owners of the N250KC, including Rogers.  When Rogers was permitted to use the N250KC, he flew out of Manassas, Virginia.

23.     Prior to purchasing a share of the N250KC, and entering into one or more shared ownership agreements, Rogers did not realize that Brown had no intention of performing as both represented prior to the purchase of a quarter-share of the N250KC and as stated in the various agreements.  To the contrary, it was Brown's intention not to perform as represented, but instead to act as though he was sole owner of the N250KC and convert Rogers' share for his own use.

24.     At the time that Brown solicited Rogers' involvement in the purchase of the N250KC, Brown was already operating the illegal charter scheme and quickly folded the N250KC into the scheme.  Indeed, less than one month after Brown induced Rogers to purchase a share of the N250KC, Brown began chartering the plane for use by non-owners using the Timesharing Agreements, which agreements were never disclosed to Rogers.

## II.     The Discovery of Brown's Illegal Charter Enterprise

25.     Only after demanding IFLYAJET's books and records related to the N250KC in December 2022 did Rogers learn that Brown is engaged in a fraudulent scheme to induce unsuspecting buyers into participating in, and funding, an illegal charter enterprise through which he offers cut-rate charter flights, subsidized by airplane owners.

26.     Despite Brown's representation regarding group ownership of a single plane, Brown seeks to convert all the planes under his management, including the N250KC, to a "fleet" of airplanes that he uses to operate an unlicensed charter business.  Through his misrepresentations, like the ones made to Rogers, he induces unsuspecting buyers to buy a share of an aircraft and then locks them in to subsidizing his charter operations.

27.     From February 2021 through June 2022, IFLYAJET entered twelve (12) different Aircraft Timesharing Agreements with non-owners concerning the N250KC.

28.     A Timesharing Agreement is an arrangement whereby a person leases his airplane with a flight crew to another person, and no charge is made for the flights conducted under that arrangement other than the specific charges identified in FAR 91.501(d).

29.     Brown offered cut rates to non-owners for their use of his managed aircraft through the Timesharing Agreements.  By offering the reduced rates, Brown relied on the owners of each aircraft, in this case Rogers, to subsidize the maintenance of the aircraft, all while limiting Rogers'

ability to use the N250KC.  This scheme resulted in a larger customer base for Brown, increased management fees, and higher fees from the purchase and share of aircraft.

30.   None of these Timesharing Agreements – essentially a lease arrangement – were disclosed to Rogers or OADS.

31.   Here, within weeks of the purchase of the N250KC, Brown began using IFLYAJET's position as a manager of the N250KC to enter into Timesharing Agreements and lease the N250KC to others, without the knowledge or consent of the owners.

32.   Brown's quick use of Timesharing Agreements for the N250KC is evidence of the fraudulent intent that existed at the time he induced Rogers into purchasing a share of the N250KC.

33.   Indeed, none of the Timesharing Agreements were disclosed to the Owners of the N250KC or approved by the Owners before being executed by IFLYAJET.

34.   Rogers only learned of the Timesharing Agreements in response to a books and records demand made by OADS to IFLYAJET on December 7, 2022.

35.   To the extent that any Timesharing Agreements bore the signatures of any owners, those signatures were obtained by using prior DocuSign signatures of the owners without authority.

36.   Brown's charter enterprise runs afoul of federal aviation laws and regulations.

37.   As a result, the N250KC has been a tool in Brown's criminal enterprise, significantly diminishing its value.

38.   Rogers spent $400,645.09 since the purchase of the N250KC to cover maintenance and usage expenses and $550,000.00 in capital expenditures.

39.   Now, however, the value of Rogers' share of the N250KC has been diminished to the point that it is unsaleable.

40.     Further, during Rogers' relationship with Brown, Brown fraudulently affixed Rogers' signature to contracts without Rogers' knowledge.

41.     For example, in October 2022, Brown fraudulently affixed Rogers' signature to a "Joint Ownership Agreement of the Owners of N250KC," which purported to add RFBC, LLC as an owner of the N250KC.

42.     Brown subsequently took the fraudulently signed documents and filed them with the Federal Aviation Administration ("**FAA**").

43.     Browns' filing of fraudulent documents with the FAA puts Rogers' pilot license at risk.

44.     As a result of Brown's wide-ranging fraud, Rogers has invested hundreds of thousands of dollars into the N250KC and now holds an unsaleable interest in an aircraft involved in a wide ranging illegal charter operation.

45.     Now, given the nature of Brown's scheme, Rogers' pilot license is at risk and his ownership stake of the N250KC is also jeopardized.

## COUNT I: FRAUD

46.     Rogers incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

47.     Brown owed duties to Rogers in connection with the negotiation of the purchase of the N250KC to refrain from making material representations or from omitting to disclose material facts.

48.     Brown breached his duties to Rogers by making material misrepresentations in connection with the negotiation of the purchase of the N250KC and from failing to disclose that Brown, through IFLYAJET, had orchestrated and was operating an illegal charter operation.

49.     Further, Brown misrepresented the nature of the enterprise when he initially

induced Rogers into purchasing a share of the N250KC.

50.     Brown represented that:  (i) the purpose of the Shared Ownership Agreement was to "engage in any lawful activity ancillary" to the ownership of the N250KC; (ii) a Member was entitled to use the N250KC in an amount consistent with its percentage interest in the N250KC; and (iii) any lease or other disposition of the N250KC could only occur with unanimous consent of the Members.

51.     Indeed, Brown was already operating an illegal charter enterprise when he induced Rogers into purchasing a share of the N250KC and, after purchasing the aircraft, quickly included it in his illegal charter enterprise using illegal Timesharing Agreements.

52.     Rogers has been harmed because of Brown's fraud and is entitled to rescissory damages for Brown's fraud, including, but limited to, reimbursement of all amounts paid in connection with Brown's fraudulent enterprise and the diminution of value in the asset purchased.

## COUNT II: DECLARATORY JUDGMENT

53.     Rogers incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

54.     During their relationship, Brown repeatedly affixed Rogers' signature to corporate documents without Rogers' consent, including, but not limited to, the October 2022, "Joint Ownership Agreement of the Owners of N250KC."

55.     The parties are facing an actual controversy and require an order from this Court declaring that Brown's practice of affixing Rogers' signature to corporate documents without his consent is fraudulent and those documents are void.

## COUNT III: PRELIMINARY AND PERMANENT INJUNCTION

56.     Rogers incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

57.     During their relationship, Brown repeatedly affixed Rogers' signature to corporate documents without Rogers' consent, including, but not limited to the October 2022, "Joint Ownership Agreement of the Owners of N250KC."

58.     Rogers subsequently filed the fraudulent documents with the Federal Aviation Administration.

59.     Rogers seeks a preliminary and permanent injunction from this Court ordering Brown to rescind any documents filed with the Federal Aviation Administration that contain the fraudulently applied signature of Philip Rogers.

60.     Rogers further seeks a preliminary and permanent injunction from this Court ordering Brown to ground the N250KC until any and all documents fraudulently filed with the Federal Aviation Administration are withdrawn and rescinded.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Philip Rogers, prays for the following judgment and relief against Defendant, Robert Brown as follows:

I.      Judgment in favor of Plaintiff, Philip Rogers and against Defendant, Robert Brown;

II.     Rescission of the Ownership Agreement and Management Agreement;

III.    Rescissory damages in the amount of $1,000,000.00;

IV.     A declaration that Brown's practice of affixing Rogers' signature to contracts and documents without permission was fraudulent and such documents are void;

V.      A preliminary and permanent injunction requiring Brown to rescind any fraudulent documents filed with the Federal Aviation Administration;

VI.     Judgment interest on all amounts awarded at no less than the judgment rate; and

VII.    Such other relief, in law or in equity, as this Court deems just and proper.

Respectfully submitted,


/s/ Stephen M. Faraci, Sr.
Stephen M. Faraci, Sr. (VSB No. 42748)
Patrick D. Houston (VSB No. 92298)
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, Virginia 23219
Telephone:  (804) 977-3301
Facsimile:  (804) 977-3298
E-Mail:  sfaraci@whitefordlaw.com
E-Mail:  phouston@whitefordlaw.com

*Attorneys for Plaintiff*