# SHARED OWNERSHIP AGREEMENT OF
# THE OWNERS OF N250KC

**THIS IS THE SHARED OWNERSHIP AGREEMENT** (together with any amendments or other modifications and supplements, and all exhibits and other attachments, to it, this "Agreement") of the registered owner group of a Gulfstream GIV, FAA Registration N250KC and bearing serial number 1025 (the "Aircraft") dated as of January ___, 2021.

As constituted, the share equity ownership in the Aircraft shall be as follows:

> IFLYAJET, Inc.          25%
> Templum Consulting, LLC   50%
> Optical Air Data Systems LLC 25%

The Members (as defined above), in consideration of the capital contributions to the purchase price of the airplane, and the mutual promises set forth in this Agreement (the mutuality, adequacy and sufficiency and receipt of which are hereby acknowledged), hereby agree as follows:

1. **General.**

    (a) <u>Formation</u>. The Group was founded January ___, 2021 with the Group's purchase of the Aircraft. The relationship of the Members is as co-owners of the Aircraft, each holding the following separate and undivided percentage interests in and to the Aircraft in an amount equal to such Member's Percentage Interest.

    (b) <u>No Personal Liability of Members</u>. No Member, Officer (as defined below), employee or agent will have any personal liability to third parties for any debt, obligation, liability or loss of the Group. No Member shall have the right to bind any other Member or the Group, except as expressly set forth herein.

    (c) <u>Registered Office and Registered Agent</u>. The owner group will maintain a registered office and registered agent in accordance with applicable law. The Manager may change the registered office and registered agent from time to time in accordance with applicable law.

2. **Purpose.**

The owner group may own, sell, lease and/or replace that certain Gulfstream GIV or any other aircraft the Group should elect to own, sell, lease and/or replace in accordance with the provisions and conditions of this Agreement (the "Aircraft") and engage in any lawful activity ancillary thereto. The home base for the Aircraft shall be determined by the Manager, subject to the provisions and conditions of this Agreement.

3. **Members.**

    (a) <u>Generally</u>. The term "Member" means a person (or entity) who signs this Agreement intending to be a Member of the ownership group, in each case until he/she/it ceases



to be a Member in accordance with Subsection (e), and each successor-in-interest to such Member in accordance with the provisions and conditions of this Agreement. The term "Group" means the ownership group, comprised of the Members.

    (b)    <u>Members</u>. The Members are:

| | |
|---|---|
| IFLYAJET, Inc. | 25% |
| Templum Consulting, LLC | 50% |
| Optical Air Data Systems, LLC | 25% |

    (c)    <u>No Withdrawal Rights</u>. No Member may withdraw from the Group without the consent of the other Members (which may not unreasonably be withheld).

    (d)    <u>No Removal</u>. No Member may be removed by the other Members except pursuant to a purchase of a Member's interest in accordance with this Agreement.

    (e)    <u>Cessation of Membership</u>. A Member will cease to be a Member (i) upon his or her withdrawal if consented to pursuant to Subsection (c), (ii) upon his or her removal in accordance with Subsection (d), or (iii) upon the transfer of his or her interest if permitted by Section 10 [Permitted Transfers] (it being the intent that the foregoing are the only events by which one ceases to be a Member, those provisions of the DLLCA that specify other events in which one ceases to be Member being hereby overridden by the foregoing contrary provisions of this Agreement).

**4.**     **Percentage Interests**.

Each Member's percentage interest in the aircraft (each, a "Percentage Interest") is as follows:

Percentage Interest

| | |
|---|---|
| IFLYAJET, Inc. | 25% |
| Templum Consulting, LLC | 50% |
| Optical Air Data Systems, LLC | 25% |
| Total | 100% |

The percentages set forth above apply in all circumstances where relevant to determining the extent of each Member's interest in the Group, including his, her or its right to vote on, consent to or otherwise participate in any decision or action to be taken by the Members under this Agreement.

**5.**     **Allocation and Distributions.**

Except as herein provided, including pursuant to the provisions and conditions of Section 14 below, he Group's net cash flow and tax profits and losses will be allocated to the Members in accordance with the Percentage Interests. The Group will make distributions to the Members at such time and in such form and amount as the Members may from time to time determine.

**6.**     **Group Management**.



(a)     General. The business and affairs of the Group shall be managed by a Manager (as hereinafter described and who, for the purposes herein set forth, may also be referred to as the "President"). The Manager shall be responsible for the day-to-day operation of the business of the Group, and shall have full and complete authority, power and discretion to manage the day-to-day operations of the Group but subject in all cases to situations in which the approval of the Members is expressly required by this Agreement or by non-waivable provisions of applicable law. The Manager shall keep complete and accurate records concerning the Group's business.

(b)     Affirmative Acts. The Manager shall take all actions which may be necessary or appropriate (i) for the continuation of the Group's valid existence as a registered owners of the aircraft, and of each other jurisdiction in which such existence is necessary to protect the limited liability of the Members or to enable the Group to conduct the business in which it is engaged and (ii) for the accomplishment of the Group's purposes in accordance with the provisions of this Agreement and applicable laws and regulations. The Manager shall be responsible for overseeing the maintenance and repair of the Aircraft, all in compliance with the manufacturer's operating and maintenance manuals for the Aircraft and with Federal Aviation Administration rules and regulations. The Manager shall properly maintain all records pertaining to the maintenance and operation of the Aircraft. The Manager shall be responsible for obtaining and maintaining all insurance for the Aircraft and the Group, in such amounts, under such forms of policies, upon such terms, for such periods and with such companies or underwriters as the Manager may elect in its reasonable discretion. The Manager shall be responsible for the Group's compliance with all representations, warranties and covenants contained in any debt instruments, including the documents evidencing the Existing Loan (in the event the Group elects to assume the Existing Loan).

(c)     Scheduling and Other Use of Aircraft. The Manager shall keep and maintain a flight schedule and calendar at corp.airplanemanager.com, which shall be available to all Members of the Group. Because the Manager has unique knowledge of various commitments and obligations relating to the Aircraft, both maintenance and otherwise, it is agreed that all flight requests shall be transmitted to the Manager or his/her designee for scheduling. The Manager shall ensure that all flights are entered on the Airplane Manager Calendar. All flight schedule changes shall be coordinated through the Manager. No person other than the Manager shall directly schedule either the Aircraft or affiliated crew members. The Manager shall have the exclusive right, when the Aircraft is not otherwise scheduled, to schedule flights or flight crew movements at the Manager's reasonable discretion and at such locations as the Manager may reasonably determine. Notwithstanding anything to the contrary contained herein, no Member shall have the right to utilize the Aircraft in any greater percentage of time that such Member's Percentage Interest.

(d)     Member Notice. The Manager shall give to each of the Members a notice pursuant to Section 15(a) hereof requesting any necessary approval, accompanied by a description in reasonable detail of the matters as to which such approval is requested. Each Member shall communicate by notice to such Manager its approval of any matters described in the notice requesting such approval within five (5) days of the date of such notice. Any Member not so responding shall be deemed not to have given its approval of the matters contained in the notice.

(e)     Prohibited Transfers. If a Member makes a transfer that is not permitted by, and is thus null and void pursuant to, Section 10 [Permitted Transfers], then that Member ceases to have management approval rights under this Section 6.

(f)     Meetings; Voting. The Members will meet as they agree or as any one Member requests on 15 days prior written notice. All actions by the Members will require the affirmative vote of the Members owning a majority of the Percentage Interests. Any such meeting may be conducted (i) by a written consent in lieu of a meeting signed by all of the Members or (ii) by means of conference telephone or communications equipment by which all Members participating in the meeting may simultaneously hear each other.

(g)     Decisions Requiring Super-Majority Member Consent. The Manager may not make any of the following decisions or actions without first obtaining the written consent of Members owning at least three-fifths of the Percentage Interests:

  i.   the Group making any change to the Manager.

(h)     Decisions Requiring Unanimous Member Consent. Notwithstanding any power or authority granted the Members under this Agreement, the Manager may not make any of the following decisions or actions without first obtaining the written consent of Members owning 100% of the Percentage Interests:

  i.   the Group's dissolution, the Group's merger, or the Group's sale, exchange, lease, or other disposition of all or substantially all of its property;

  ii.  the Group's incurring indebtedness, or assuming indebtedness, for borrowed money;

  iii. the Group's sale, lease, or disposition of the Aircraft;

  iv.  the Group's lending or advancing of any monies, including the guaranteeing or indemnifying of any indebtedness, liability or obligation of any person, other than the granting of trade credit in the ordinary course of business;

  v.   making any capital expenditure or incurring any operating expense in excess of $50,000.00 per occurrence or in excess of $100,000.00 in the aggregate during any calendar year;

  vi.  Engaging in any activity, other than ordinary maintenance and repair activities, which would cause the Aircraft to be out of service for any extended period of time; or

  vii. Engaging in any other transaction described in this Agreement as requiring the unanimous consent of the Members.

7.   **Officers**.

The Members may appoint one or more individuals to act as officers of the Group ("Officers") on behalf of the Group. The initial Officers are as follows:

4

| Title | Name |
|---|---|
| President and Manager | Robert Brown |
| Vice President and Secretary | Courtney Lee |
| Treasurer | Eliza Brown |

The Members may at any time and from time to time remove and replace, and otherwise fill a vacancy as to, any Officer. Subject to the provisions of Section 6, each Officer will have such power and authority as are customarily delegated to persons holding equivalent titles in a limited liability Group. The President and the Vice President will have authority to execute all documents and instruments on behalf of the Group, and the Secretary will have authority to attest to all such actions.

## 8. Duties of Members and Officers.

(a) Generally. Each Member and Officer will act: (i) in a manner he believes in good faith to be in the best interests of the Group and (ii) with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

(b) Transactions with Members and Officers. No Member or Officer may enter into or amend the terms of any transaction or series of transactions between any of the following unless the transaction or amendment has been approved by all of the Members: (i) the Group and any Member or affiliate of a Member or (ii) the Group and any Officer or affiliate of an Officer.

(c) Complete Statement of Fiduciary Duties. The provisions of this Agreement replace, eliminate and otherwise supplant those duties (including fiduciary duties) that a Member, Manager or Officer might otherwise have under applicable law.

## 9. Exculpation and Indemnification.

Except as provided in this Section 9 or by reason of a breach under this Agreement, no Member or Officer will be personally liable to the Group, any Member or any other person for monetary damages for any act or omission of a Manager or Officer to the Group, any Member or any other person. Notwithstanding anything to the contrary contained herein, each Member and Officer shall indemnify, defend and hold harmless the other Members and Officers from any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatever (including, without limitation, attorneys' fees and costs) arising from the gross negligence, willful misconduct, or violation of law by such Member or Officer or such Member's or Officer's employees, officers, directors, members, managers, partners, trustees, beneficiaries, agents, representatives, affiliates, licensees or invitees.

## 10. Permitted Transfers.

(a) With Member Consent. A Member may not transfer any or all of his or her other interest in the Group unless he or she obtains the prior written consent of all the other Members (which consent may not be unreasonably withheld), and if given is expected to include a requirement that the transferee agree in writing to be bound by this Agreement). For purposes of this Agreement, "transfer" (and variations of it) means and includes any transfer or assignment

5

(including any granting of a security interest or gift), voluntarily or involuntarily, and whether by operation of law (including upon death) or by any other manner.

(b)     <u>Transfers to Self or Family Members</u>. Notwithstanding Subsection (a) above, a Member may transfer all of his, her or its interest in the Group by and between any entity wholly owned by the Member at any time, or upon his or her death to that Member's spouse or lineal descendants or to any trust for the benefit of, or any entity owned by, that Member's principal, spouse or lineal descendants or some combination of them. Upon and effective with a Member's death, his or her entire interest in the Group (including his or her status as a Member) transfers to his, her or its executor, administrator or other personal representatives without any act by the deceased Member or the Group until transferred by the personal representative in accordance with this Agreement pursuant to either the deceased Member's will or applicable law.

(c)     <u>Purchase Option</u>. In the event that a Member's request to transfer any of his, her or its interest in the Group is rejected pursuant to Section 10(a), the transfer of such interest in the Group shall be permitted as follows:

i.     The Member, having received an offer to buy, or solicited an offer to sell, all or any portion of its interest in the Group, and desiring to accept said offer or respond favorably to said solicitation (the "Offeror"), which is rejected pursuant to Section 10(a) (the date of such rejection being the "Rejection Date"), shall, following such rejection, be deemed to have made an offer (the "Offer") to sell his, her or its interest in the Group or such portion thereof to the other Members (the "Offerees"), in proportion to such Offeree's Percentage Interests at the time of the Offer, for a total purchase price equal to the Offeror's Percentage Interest multiplied by the most recent Aircraft Blue Book value of the Aircraft (net of any debts of the Offeror) (the "Purchase Price"). As used herein the term "Aircraft Blue Book" shall mean the Aircraft Blue Book Value Reference Guide.

ii.     Within fifteen (15) days following the Rejection Date, each Offeree shall notify the Offeror and each other Offeree either that he or she desires to accept the Offer or that he or she desires to reject the Offer, and a failure by an Offeree to provide either such notice within said fifteen (15) days shall be considered a rejection of the Offer by such Offeree. If at least one Offeree sends a timely notice of acceptance, then the Offer shall be considered to have been accepted by all Offerees who have sent timely notices of acceptance in proportion to their respective Percentage Interests.

iii.     In the case of acceptance of the Offer, the contract for the sale and purchase of the subject interest of the Offeror in the Group formed pursuant to said acceptance shall be closed within thirty (30) days of the making thereof or such other period as may be agreed upon. At such closing, the Offeror shall deliver his, her or its interest in the Group free of liens, claims, options, charges, encumbrances or rights of others to the Offeree(s) and the Offeror shall so represent and warrant, and further represent and warrant that he or she is the record and beneficial owner of such interest to the Offeree(s), the Offeree(s) shall deliver at closing their pro rata share of the Purchase Price to Offeror, and all parties shall execute such documents as are appropriate.

iv.     To the extent the Offerees have not exercised their rights to purchase as described above as to the Offeror's interest in the Group, then the Offeror may sell the Offeror's



interest in the Group to the proposed transferee at not less than the price specified in the Offer on terms not more favorable to the proposed transferee than those set forth in the Offer, provided that (i) such transfer is consummated within sixty (60) days after the end of the final applicable notice period set forth above, (ii) such transfer is in accordance with all the terms and conditions hereof, and (iii) the proposed transferee executes and delivers to the Group an instrument of adherence to this Agreement. If the Offeror fails to consummate the transfer of the Offeror's interest in the Group to such third party transferee within such sixty (60) day period, then the purchase rights of the Offerees under this Section shall be deemed to be revived with respect to Offeror's interest in the Group, and no transfer shall thereafter be effected by the Offeror without first offering the Offeror's interest in the Group in accordance with this Section.

        v.    In connection with any sale pursuant to this Section 10(c), the transferee(s) shall assume all of the Offeror's obligations under this Section 10 and all other provisions of this Agreement and all other duties of the Offeror inherent in the Offeror's such interest in the Group, and, to the extent that such obligations and duties are owed to the Offerees or the Group, the Offeror shall be released therefrom.

    (d)    <u>Other</u>. Any transferee permitted by this Section 10 will succeed to the rights of the transferring Member and will become a Member of the Group. ANY TRANSFER IN VIOLATION OF THE FOREGOING IS NULL AND VOID AND OF NO FORCE AND EFFECT.

**11.    <u>Assignment; Successors and Assigns.</u>**

Except with consent of other Members (which may be withheld for any reason or no reason) and except as provided in Section 10 [Permitted Transfers], no rights under the Agreement or interest in the Group may be assigned. This Agreement: (a) is binding upon each of the parties and his, her or its executors, administrators and personal representatives, heirs, devisees, legatees, beneficiaries or other successors and assigns; and (b) inures to the benefit of each of the parties and his, her or its permitted executors, administrators and personal representatives, heirs, devisees, legatees, beneficiaries or other permitted successors and assigns (and thus a non-permitted successor or assign acquires no rights from the purported assignment). For purposes of this Agreement, "assign" (and variations of it) means and includes any assignment, in whole or in part, voluntarily or involuntarily, and whether by operation of law (including upon death) or by any other manner.

**12.    <u>Amendments to this Agreement</u>.**

Any amendment or modification to this Agreement or any termination or cancellation of this Agreement must be made in writing and signed by all Members in order to be effective.

**13.    <u>Contributions to the Group and Capital Accounts</u>.**

    (a)    <u>Contributions after the Funding of the Capital Commitments</u>. Each of the Members shall make an initial Capital Contribution to the Group for the acquisition of the Aircraft. If, after the making of the initial Capital Contributions, the Group does not have sufficient funds to pay a legitimate and reasonably required funding need with respect to the Group, then the President may send a written notice to all Members calling for capital contributions (a "Capital Call Notice") to fund such expenses. If any Capital Call Notice is given in accordance with the preceding sentence,

then each Member, within thirty (30) days after the receipt of such Capital Call Notice, shall fund its proportional share (based on the Member's Percentage Interests) of the capital contributions required by such Capital Call Notice.

(b) <u>Failure to Fund</u>. If any Member fails to pay a capital contribution due under Section 14(a) on or before the date such capital contribution is due (as set forth in the Capital Call Notice), then such Member shall be deemed a "Nonparticipating Member" and the other Members shall have the option, but not the obligation, to contribute an amount up to the Nonparticipating Member's share of such capital contribution (the "Shortfall"). If more than one Member (each a "Participating Member") elects to fund such Shortfall, the Participating Members shall be deemed to fund the Shortfall pro rata relative to all Participating Members (using the Participating Member's Percentage Interest as of the date of such funding), unless the Participating Members agree otherwise, and each Participating Member shall make such additional capital contributions in an amount not to exceed such Shortfall. In such event, the sum of the Shortfall contribution made by the Participating Member(s) shall be treated as a loan to the Nonparticipating Member bearing interest at a rate equal to the lower of (i) twelve percent (12%) per annum, or (ii) the maximum interest rate permitted by applicable law (each, a "Shortfall Loan"). Notwithstanding anything to the contrary contained herein, unless earlier paid by the Nonparticipating Member, each Shortfall Loan shall be repaid from the first available revenues produced from the Property and available for distribution to the Members, but in no event later than from the proceeds of the sale of the Aircraft. The provisions set forth in this Section 14(b) do not constitute a penalty or forfeiture, but instead represent a reasonable attempt to compensate Participating Members for the opportunity cost of contributing to the Group to satisfy the Shortfall.

14. **<u>Miscellaneous.</u>**

(a) <u>Notices</u>. Each notice under this Agreement will be in writing and given either (i) in person or (ii) by a nationally recognized next business day delivery service for next business day delivery (costs prepaid) or (iii) by fax or e-mail and in the case of this clause (iii), with a confirming copy sent by a nationally recognized next business day delivery service electing, and being timely delivered to such courier for, next business day delivery (costs prepaid). In the case of clauses (ii) and (iii), such notice will be given to the last known business address, fax number or e-mail address of the party being given notice or to such other address as a person may furnish to the other as provided in this sentence. If notice is given pursuant to the foregoing of a permitted successor or assign, then notice will thereafter be given pursuant to the foregoing to such permitted successor or assign.

(b) <u>Certain Defined Terms</u>. For purposes of this Agreement (whether or not underlined): (i) "applicable law" means each provision of any constitution, statute, law, rule, regulation, decision, order, decree, judgment, release, license, permit, stipulation or other official pronouncement enacted, promulgated or issued by any governmental authority or arbitrator or arbitration panel; (ii) "governmental authority" means any legislative, executive, judicial, quasi-judicial or other public authority, agency, department, bureau, division, unit, court or other public body or person; (iii) "party" and "parties" and variations of such means each or all, as appropriate, of the persons who have executed and delivered (or have joined or otherwise become subject to) this Agreement; and each such term and variations of them and each defined term referring to a party also refers to each permitted successor or assign of such a party, and when appropriate to

effect the binding nature of this Agreement for the benefit of another party, any other successor or assign of such a party; and (iv) person" means any individual, sole proprietorship, partnership, corporation, joint venture, limited liability Group, estate, trust, unincorporated organization, association, institution, or other entity or governmental authority.

(c) <u>Certain Rules of Construction</u>. For purposes of this Agreement: (i)"including" and any other words or phrases of inclusion will not be construed as terms of limitation, so that references to "included" matters will be regarded as non-exclusive, non- characterizing illustrations; (ii) "will" has the same meaning as "shall" and thus means an obligation and an imperative and not a futurity; (iii) titles and captions of or in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any of its provisions; (iv) whenever the context requires, the singular includes the plural and the plural includes the singular, and the gender of any pronoun includes the other genders; (v) any reference to any statutory provision includes each successor provision and all applicable law as to such provision; and (vi) acknowledging that the parties have participated jointly in the negotiation and drafting of this Agreement, if an ambiguity or question of intent or interpretation arises as to any aspect of this Agreement, then it will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(d) <u>Integration; Waiver</u>. This Agreement constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior agreements, if any, of the parties with respect to its subject matter. The failure of any party at any time or times to require the performance of any provisions of this Agreement will in no manner affect the right to enforce the same; and no waiver by any party of any provision (or of a breach of any provision) of this Agreement, whether by conduct or otherwise, in any one or more instances, will be deemed or construed either as a further or continuing waiver of any such provision or breach or as a waiver of any other provision (or of a breach of any other provision) of this Agreement.

(e) <u>Controlling Law</u>. This Agreement is governed by, and will be construed and enforced in accordance with, the laws of the State of Georgia.

(f) <u>Copies</u>. This Agreement may be executed in two or more copies, each of which will be deemed an original, and it will not be necessary in making proof of this Agreement or its terms to produce or account for more than one of such copies.

(g) <u>Books and Records</u>. At all times during the existence of the Group, the Manager shall keep or cause to be kept complete and accurate books and records as shall be appropriate and adequate for the Group's business, including, without limitation, all books and records for the Aircraft required by any applicable laws or regulations. Such books and records, whether financial, operational or otherwise, and including a copy of this Agreement and any amendments thereto, shall at all times be maintained at the principal place of business of the Group. Any Member or his or its duly authorized representative shall have the right at any time to inspect and copy from such books and documents during normal business hours and the Manager shall not have the right to keep any information relating to the Group confidential from any Member. Forthwith upon request, the Manager shall also furnish to the Members such other information bearing on the financial condition and operations of the Group as any Member shall reasonably propose.

(h)     <u>No Partnership</u>. Nothing herein contained shall be construed to consider the Members as partners or joint venturers, nor constitute any Member the agent of another or in any manner limit the parties in the carrying on of their respective businesses or activities.

(i)     <u>Attorneys' Fees</u>. If an action is brought to enforce or interpret the provisions and conditions of this Agreement, the prevailing party shall be entitled to recover its actual attorneys' fees and costs.

**DULY EXECUTED** and delivered by the undersigned Members, effective as of January ____, 2021.

IFLYAJET, INC.

By: _____
Name: _____
Title: _____
Address: _____
Email: _____

Templum Consulting, LLC

By: _____
Name: _____
Title: _____
Address: _____
Email: _____

Optical Air Data Systems, LLC

By: *[signature]*
Name: PHILIP L. Rogers
Title: Member
Address: 10781 James Payne Ct. Manassas, VA 20110
Email: progers@oads.com

10



P:\17\17404\Gulfstream\N250KC Partnership Agreement Rev 2.0 121720 v2 (2002).docx

1



EXHIBIT B