## JOINT OWNERSHIP AGREEMENT OF
## THE OWNERS OF N250KC

**THIS IS THE JOINT OWNERSHIP AGREEMENT** (together with any amendments or other modifications and supplements, and all exhibits and other attachments, to it, this "Agreement") of the registered owner group of a Gulfstream G-IV, FAA Registration N250KC and bearing serial number 1025 (the "Aircraft") dated as of July ~~30~~ 2021.

As constituted, the respective ownership interests in the Aircraft are as follows (each below an "Owner" and sometimes collectively referred to herein as the "Owners"):

| | |
|---|---|
| IFLYAJET, Inc. | 1% |
| 3450 AIP, LLC | 24.75% |
| Optical Air Data Systems, LLC | 24.75% |
| Templum Consulting, LLC | 24.75% |
| PTSC, LLC | 24.75% |

The Owners (as defined above), in consideration of their respective capital contributions to the purchase price of the Aircraft, and the mutual promises set forth in this Agreement (the mutuality, adequacy and sufficiency and receipt of which are hereby acknowledged), hereby agree as follows:

1. **General.**

    (a) <u>Formation</u>. The relationship of the Owners is as joint registered owners of the Aircraft only, each holding the undivided percentage interests in and to the Aircraft in the respective amounts as set forth in Section 4 hereof.

    (b) <u>No Individual Liability of Owners</u>. No Owner will have any individual liability to any other Owner, or any third party, for any debt, obligation, liability or loss except as may be specifically set forth herein, if at all. No Owner shall have the right to bind any other Owner, except as expressly set forth herein.

2. **Purpose; Home Base of Aircraft.**

The Owners may own, sell, lease and/or replace that certain Gulfstream G-IV or any other aircraft the Owners may elect to own, sell, lease and/or replace in accordance with the provisions and conditions of this Agreement, if at all. The home base for the Aircraft (the "Home Base") shall be determined by the Manager, subject to the provisions and conditions of this Agreement.

3. **Owners.**

    (a) <u>Generally</u>. The term "Owner" means a person (or entity) who signs this Agreement, in each case until it ceases to be an Owner in accordance with Subsection 3(e) or Section 7 hereof, and each successor-in-interest to such Owner in accordance with the provisions and conditions of this Agreement.

    (b) <u>Owners</u>. The Owners are:

| | |
|---|---|
| IFLYAJET, Inc. | 1% |
| Templum Consulting, LLC | 24.75% |
| 3450 AIP, LLC | 24.75% |
| PTSC, LLC | 24.75% |
| Optical Air Data Systems, LLC | 24.75% |

(c)     Cessation of Ownership. An Owner will cease to be an Owner upon the transfer of its ownership interest in the Aircraft if permitted by Section 10.

4.     **Percentage Interests.**

Each Owner's percentage interest in the Aircraft (each, a "Percentage Interest") is as follows:

| | Percentage Interest |
|---|---|
| IFLYAJET, Inc. | 1% |
| 3450 AIP, LLC | 24.75% |
| Templum Consulting, LLC | 24.75% |
| PTSC, LLC | 24.75% |
| Optical Air Data Systems | 24.75% |
| Total | 100% |

The percentages set forth above apply in all circumstances where relevant to determining the extent of each Owner's interest in the Aircraft, including his, her or its right to vote on, consent to or otherwise participate in any decision or action to be taken by the Owners under this Agreement.

5.     **Aircraft Management.**

(a)     General. The Aircraft shall be managed by IFLYAJET, Inc. (the "Manager") under and pursuant to an Aircraft Management Agreement that will be signed by the Manager and each Owner. The Manager shall be responsible for the day-to-day operations and management of the Aircraft, all as more specifically set forth in the Management Agreement, except as otherwise provided herein.

(b)     Management of Aircraft. The Manager shall be responsible for overseeing the maintenance and repair of the Aircraft, all in compliance with the manufacturer's operating and maintenance manuals for the Aircraft and with Federal Aviation Administration rules and regulations. The Manager shall properly maintain all records pertaining to the maintenance and operation of the Aircraft. The Manager shall be responsible for obtaining and maintaining all insurance for the Aircraft and the Owners, in such amounts, under such forms of policies, upon such terms, for such periods and with such companies or underwriters as the Owners may elect from time to time.

(c)     Scheduling and Other Use of Aircraft. The Manager shall keep and maintain a flight schedule and calendar at corp.airplanemanager.com, which shall be available to the Owners. Because the Manager has unique knowledge of various commitments and obligations relating to

the Aircraft, both maintenance and otherwise, it is agreed that all flight requests shall be transmitted to the Manager or his/her designee for scheduling. The Manager shall ensure that all flights are entered on the Airplane Manager Calendar. All flight schedule changes shall be coordinated through the Manager. No person other than the Manager shall directly schedule the Aircraft. The Manager shall have the exclusive right, when the Aircraft is not otherwise scheduled, to schedule flights or flight crew movements at the Manager's reasonable discretion and at such locations as the Manager may reasonably determine.

(d) <u>Owner Notice</u>. The Manager shall give to each of the Owners a notice pursuant to Section 11(a) hereof requesting any necessary approval, accompanied by a description in reasonable detail of the matters as to which such approval is requested. Each Owner shall communicate by notice to such Manager its approval of any matters described in the notice requesting such approval within five (5) days of the date of such notice. Any Owner not so responding shall be deemed not to have given its approval of the matters contained in the notice.

(e) <u>Prohibited Transfers</u>. If an Owner makes a transfer that is not permitted by, and is thus null and void pursuant to, Section 7 hereof, then that Owner ceases to have management approval rights under this Section 5.

(f) <u>Meetings; Voting</u>. The Owners will meet as they agree or as any one Owner requests on 15 days prior written notice. All actions by the Owners will require the affirmative vote of the Owners owning a majority of the Percentage Interests. Any such meeting may be conducted (i) by a written consent in lieu of a meeting signed by all of the Owners or (ii) by means of conference telephone or communications equipment by which all Owners participating in the meeting may simultaneously hear each other.

(g) <u>Decisions Requiring Unanimous Owner Consent</u>. Notwithstanding any power or authority granted the Owners under this Agreement, the Manager may not take any of the following decisions or actions without first obtaining the written consent of Owners owning 100% of the Percentage Interests:

    i. the sale, lease, or disposition of 100% of the Percentage Interests in the Aircraft;

    ii. making any capital expenditure or incurring any operating expense in excess of $50,000.00 per occurrence or in excess of $100,000.00 in the aggregate during any calendar year;

    iii. Making any change to the Manager;

    iv. Engaging in any activity, other than ordinary maintenance and repair activities, which would cause the Aircraft to be out of service for any extended period of time; or

    v. Engaging in any other transaction described in this Agreement as requiring the unanimous consent of the Owners.

3

For clarification and avoidance of doubt, with the exception of the matters set forth in subsection (g), above, any other actions of the Owners may be taken by the vote of, or the written consent of, Owners holding at least 51% of the aggregate Percentage Interests in the Aircraft.

6. **Exculpation and Indemnification.**

Each Owner agrees to indemnify and hold harmless the other Owners and the Manager, and their respective members, owners, officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporation, successors and assigns (the "Indemnified Parties") from and against any loss, liability, claim, damage, fine, penalty, taxes and expense (including, but not limited to, costs of investigation, defense and reasonable fees incurred for attorneys, expert witnesses, consultants, or litigation support) or diminution in value (each an "Indemnified Loss") which solely arises from or solely caused by any actions or omissions to act of the Owner as may be contemplated in connection with the ownership and operation of the Aircraft by the Owner as provided under this Agreement or the Management Agreement. Notwithstanding this indemnity obligation, nothing in this Agreement shall be construed so as to provide an indemnity obligation on behalf of an Owner for any Indemnified Loss to the extent that said Indemnified Loss is caused by any other Owner's or the Manager's (i) negligence; (ii) gross negligence; (iii) acts or omissions in breach of this Agreement; or (iii) willful misconduct. Notwithstanding the foregoing, it is agreed by the Owners that the Owners expressly waive and release each other and their affiliates, owners, members, shareholders, officers, agents, employees, successors and assigns from any and all liability arising from or related to any claim or loss involving the use, operation, or ownership of the Aircraft to the extent that any claim or loss is covered by the insurance policies and coverages required to be provided by Manager, whether under this Agreement or the Management Agreement. If and to the extent that any claim or loss falls outside of the waiver provisions immediately above (e.g., a lien claim against the Aircraft or an FAA fine or penalty caused by the action of an Owner of the Manager, or a claim or loss which is denied or rejected by the carrier due to any act or omission of an Owner or the Manager, then the Owner or the Manager, as applicable, shall defend, indemnify and hold harmless the other Owners as provided above. No party shall be liable to the other parties, under any circumstance or theory of recovery, for any incidental, consequential, punitive, or exemplary damages of any kind or character, all of which are expressly waived.

7. **Permitted Transfers.**

(a) <u>With Owner Consent</u>. An Owner may not transfer any or all of its ownership interests in the Aircraft unless it obtains the prior written consent of all the other Owners (which consent may not be unreasonably withheld), and if given is expected to include arequirement that the transferee agree in writing to be bound by this Agreement). For purposes of this Agreement, "transfer" (and variations of it) means and includes any transfer or assignment (including any granting of a security interest or gift), voluntarily or involuntarily, and whether byoperation of law (including upon death) or by any other manner.

(b) <u>Transfers to Affiliate</u>. Notwithstanding subsection (a) above, an Owner may transfer all of its ownership interest in the Aircraft to any entity wholly owned by, or under

common ownership with, the Owner at any time, or to the spouse or lineal descendants or to any trust for the benefit of, or any entity owned by, the individual owner of, an Owner.

(c) <u>Purchase Option</u>. In the event that an Owner's request to transfer any of its interest in the Aircraft is rejected pursuant to Section 7(a), the transfer of such interest in the Aircraft shall be permitted as follows:

i. The Owner, having received an offer to buy, or solicited an offer to sell, all or any portion of its ownership interest in the Aircraft, and desiring to accept said offer or respond favorablyto said solicitation (the "Offeror"), which is rejected pursuant to Section 7(a) (the date of such rejection being the "Rejection Date"), shall, following such rejection, be deemed to have made anoffer (the "Offer") to sell his, her or its ownership interests in the Aircraft or such portion thereof to the other Owners (the "Offerees"), in proportion to such Offeree's Percentage Interests at the time of the Offer, for a total purchase price equal to the Offeror's Percentage Interest multiplied by the most recent Aircraft Blue Book value of the Aircraft (net of any debts of the Offeror under this Agreement) (the "Purchase Price"). As used herein the term "Aircraft Blue Book" shall mean the Aircraft Blue Book Value Reference Guide.

ii. Within fifteen (15) days following the Rejection Date, each Offeree shall notify the Offeror and each other Offeree either that it desires to accept the Offer or that it desires to reject the Offer, and a failure by an Offeree to provide either such notice within said fifteen (15) days shall be considered a rejection of the Offer by such Offeree. If at least one Offeree sends a timely notice of acceptance, then the Offer shall be considered to have been accepted by all Offerees who have sent timely notices of acceptance in proportion to their respective Percentage Interests.

iii. In the case of acceptance of the Offer, the contract for the sale and purchase of the subject interest of the Offeror in the Aircraft shall be closed within thirty (30) days of the making thereof or such other period as may be agreed upon. At such closing, the Offeror shall deliver its ownership interests in the Aircraft free of liens, claims, options, charges, encumbrances or rights of others to the Offeree(s) and the Offeror shall so represent and warrant, and further represent and warrant that he or she is the record and beneficial owner of such interests to the Offeree(s), the Offeree(s) shall deliver at closing their respective pro rata sharesof the Purchase Price to Offeror in cash, and all parties shall execute such documents as are appropriate.

iv. If all Offerees have not exercised their rights to purchase as described above, then the Offeror may sell the Offeror's interest in the Aircraft to the proposed transferee at not less than the price specified in the Offer onterms not more favorable to the proposed transferee than those set forth in the Offer, provided that such transfer is consummated within sixty (60) days after the end of the final applicable noticeperiod set forth above, (ii) such transfer is in accordance with all the terms and conditions hereof,and (iii) the proposed transferee executes and delivers to the Group an instrument of adherence tothis Agreement. If the Offeror fails to consummate the transfer of the Offeror's interest in the Aircraft to such third party transferee within such sixty (60) day period, then the purchase rights ofthe Offerees under this Section shall be deemed to be revived with respect to Offeror's interest inthe Aircraft, and no transfer shall thereafter be effected by the Offeror without first offering the Offeror's interest in the Aircraft in accordance with this Section.

5

          v.      In connection with any sale pursuant to this Section 7(c), the transferee(s) shall assume all of the Offeror's obligations under this Section 7 and all other provisions of this Agreement and all other duties of the Offeror inherent in the Offeror's such interest in the Aircraft, including the Management Agreement, and, to the extent that such obligations and duties are owed to the Offerees, the Offeror shall be released therefrom.

        (d)    <u>Other</u>. Any transferee permitted by this Section 7 will succeed to the rights of the transferring Owner and will become an Owner of the Aircraft. ANY TRANSFER IN VIOLATION OF THE FOREGOING IS NULL AND VOID AND OF NO FORCE AND EFFECT.

## 8.   <u>Assignment; Successors and Assigns.</u>

Except with consent of other Owners (which may not be unreasonably withheld or conditioned) and except as provided in Section 7, no rights or obligations under this Agreement or interest in the Aircraft may be assigned. This Agreement: (a) is binding upon each of the parties and its successors and assigns; and (b) inures to the benefit of each of the parties and its successors and assigns (and thus a non-permitted successor or assign acquires no rights from the purported assignment). For purposes of this Agreement, "assign" (and variations of it) means and includes any assignment, in whole or in part, voluntarily or involuntarily, and whether by operation of law (including upon death) or by any other manner.

## 9.   <u>Amendments to this Agreement.</u>

Any amendment or modification to this Agreement or any termination or cancellation of this Agreement must be made in writing and signed by all Owners in order to be effective.

## 10.   <u>Contributions to Fund Accounts.</u>

        (a)    <u>Contributions after the Funding of the Capital Commitments</u>. Each of the Owners has made, or shall make, an initial Capital Contribution to the Manager for the acquisition of the Aircraft or, as applicable, its respective Percentage Interest in the Aircraft, in the amounts as set forth in Section 4. If at any time the Manager does not have sufficient funds to pay a legitimate and reasonably required funding need with respect to the Aircraft, then the Manager may send a written notice to all Owners calling for additional funds (a "Fund Notice") to fund such expenses. If any Fund Notice is given in accordance with the preceding sentence, then each Owner, within thirty (30) days after the receipt of such Fund Notice, shall fund its proportional share (based on the Owner's Percentage Interests) of the funds required by such Fund Notice.

        (b)    <u>Failure to Fund</u>. If any Owner fails to pay a funding contribution due under Section 10(a) on or before the date such funds are due (as set forth in the Fund Notice), then such Owner shall be deemed a "Nonparticipating Owner" and the other Owners shall have the option, but not the obligation, to contribute an amount up to the Nonparticipating Owner's share of such funding contribution (the "Shortfall"). If more than one Owner (each a "Participating Owner") elects to fund such Shortfall, the Participating Owners shall be deemed to fund the Shortfall pro rata relative to all Participating Owners (using the Participating Owner's Percentage Interest as of the date of such funding), unless the Participating Owners agree otherwise, and each Participating

6

Owner shall make such additional fund contributions in an amount not to exceed such Shortfall. In such event, the sum of the Shortfall contribution made by the Participating Owner(s) shall be treated as a loan to the Nonparticipating Owner bearing interest at a rate equal to the lower of (i) twelve percent (12%) per annum, or (ii) the maximum interest rate permitted by applicable law (each, a "Shortfall Loan"). Notwithstanding anything to the contrary contained herein, unless earlier paid by the Nonparticipating Owner, each Shortfall Loan shall be repaid from the first available revenues produced from the Aircraft and available for distribution to the Owners, if any, but in no event later than from the proceeds of the sale of the Aircraft, if that should occur. The provisions set forth in this Section 10(b) do not constitute a penalty or forfeiture, but instead represent a reasonable attempt to compensate Participating Owners for the opportunity cost of contributing to satisfy the Shortfall.

11. **Miscellaneous.**

(a) <u>Notices</u>. Each notice under this Agreement will be in writing and given either (i) in person or (ii) by a nationally recognized next business day delivery service for next business day delivery (costs prepaid) or (iii) by fax or e-mail and in the case of this clause (iii), with a confirming copy sent by a nationally recognized next business day delivery service electing, and being timely delivered to such courier for, next business day delivery (costs prepaid). In the case of clauses (ii) and (iii), such notice will be given to the last known business address, fax number or e-mail address of the party being given notice or to such other address as a person may furnish to the other as provided in this sentence. If notice is given pursuant to the foregoing of a permitted successor or assign, then notice will thereafter be given pursuant to the foregoing to such permitted successor or assign.

(b) <u>Certain Defined Terms</u>. For purposes of this Agreement (whether or not underlined): (i) "applicable law" means each provision of any constitution, statute, law, rule, regulation, decision, order, decree, judgment, release, license, permit, stipulation or other official pronouncement enacted, promulgated or issued by any governmental authority or arbitrator or arbitration panel; (ii) "governmental authority" means any legislative, executive, judicial, quasi-judicial or other public authority, agency, department, bureau, division, unit, court or other public body or person; (iii) "party" and "parties" and variations of such means each or all, as appropriate, of the persons who have executed and delivered (or have joined or otherwise become subject to) this Agreement; and each such term and variations of them and each defined term referring to a party also refers to each permitted successor or assign of such a party, and when appropriate to effect the binding nature of this Agreement for the benefit of another party, any other successor or assign of such a party; and (iv) "person" means any individual, sole proprietorship, partnership, corporation, joint venture, limited liability Group, estate, trust, unincorporated organization, association, institution, or other entity or governmental authority.

(c) <u>Certain Rules of Construction</u>. For purposes of this Agreement: (i) "including" and any other words or phrases of inclusion will not be construed as terms of limitation, so that references to "included" matters will be regarded as non-exclusive, non- characterizing illustrations; (ii) "will" has the same meaning as "shall" and thus means an obligation and an imperative and not a futurity; (iii) titles and captions of or in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement

4850-6153-1120v5
2954235-000001 07/23/2021

or the intent of any of its provisions; (iv) whenever the context requires, the singular includes the plural and the plural includes the singular, and the gender of any pronoun includes the other genders; (v) any reference to any statutory provision includes each successor provision and all applicable law as to such provision; and (vi) acknowledging that the parties have participated jointly in the negotiation and drafting of this Agreement, if an ambiguity or question of intent or interpretation arises as to any aspect of this Agreement, then it will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(d) <u>Integration; Waiver</u>. This Agreement constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior agreements, if any, of the parties with respect to its subject matter. The failure of any party at any time or times to require the performance of any provisions of this Agreement will in no manner affect the right to enforce the same; and no waiver by any party of any provision (or of a breach of any provision) of this Agreement, whether by conduct or otherwise, in any one or more instances, will be deemed or construed either as a further or continuing waiver of any such provision or breach or as a waiver of any other provision (or of a breach of any other provision) of this Agreement.

(e) <u>Controlling Law</u>. This Agreement is governed by, and will be construed and enforced in accordance with, the laws of the State of Georgia.

(f) <u>Copies</u>. This Agreement may be executed in two or more copies, each of which will be deemed an original, and it will not be necessary in making proof of this Agreement or its terms to produce or account for more than one of such copies.

(g) <u>Books and Records</u>. At all times during the existence of this Agreement, the Manager shall keep or cause to be kept complete and accurate books and records as shall be appropriate and adequate, including, without limitation, all books and records for the Aircraft required by any applicable laws or regulations. Such books and records, whether financial, operational or otherwise, and including a copy of this Agreement and any amendments thereto, shall at all times be maintained at the principal place of business of the Manager. Any Owner or his or its duly authorized representative shall have the right at any time to inspect and copy from such books and documents during normal business hours and the Manager shall not have the right to keep any information confidential from any Owner. Forthwith upon request, the Manager shall also furnish to the Owners such other information bearing on the financial condition and operations of the Aircraft as any Owner shall reasonably request.

(h) <u>No Partnership</u>. Nothing herein contained shall be construed to consider the Owners as partners or joint venturers, nor constitute any Owner the agent of another or in any manner limit the parties in the carrying on of their respective businesses or activities.

(i) <u>Attorneys' Fees</u>. If an action is brought to enforce or interpret the provisions and conditions of this Agreement, the prevailing party shall be entitled to recover its actual attorneys' fees and costs.

4850-6153-1120v5
2954235-000001 07/23/2021

   (j) <u>Arbitration</u>. Except for claims for injunctive relief (which the parties hereby agree should be litigated in federal or state court in Atlanta, GA) any dispute between or among the Owners (including the determination of the scope of applicability of this Agreement to arbitrate) shall be determined by an arbitration to take place in Atlanta, GA, before a panel of three (3) arbitrators, in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"); unless the amount of the claim(s) asserted by either party is less than $1,000,000.00, exclusive of interest and attorney's fees, in which case the arbitration shall be heard and determined by a single arbitrator in Atlanta, GA. After the Arbitration has been filed with the AAA, the AAA shall simultaneously submit to each party an identical list of ten (10) proposed arbitrators from its roster of arbitrator's who practice in the Atlanta, GA area, from which the arbitrator(s) shall be appointed.

   The parties are encouraged to agree on an arbitrator or arbitrators from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator or arbitrators, each party may strike four (4) names from the list and return it to the AAA within seven (7) days from the date of the AAA's mailing to the parties. If for any reason the parties cannot then reach an agreement on the appointment of an arbitrator or arbitrators cannot be made from the unstruck names on the list, the AAA may make the appointment of the arbitrator(s) from the unstruck names on the list without the submission of additional lists.

   The parties will be given notice by the AAA of the appointment of the arbitrator(s), who shall be subject to disqualification for the reasons specified in AAA Section R-18. The parties shall notify the AAA within seven (7) calendar days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

The arbitration proceedings shall be conducted before a panel of one (1) to three (3) neutral arbitrators (depending on the amount in controversy), all of whom shall be members of the State Bar of Georgia, and actively engaged in the practice of law (either as a lawyer or former judge) for at least ten (10) years. The arbitrator(s) will have no authority to award punitive damages. The arbitrator(s) shall award to the prevailing party, if any, as determined by the arbitrator(s) all of its costs and fees incurred in connection with the arbitration. "Costs and fees" shall include all attorneys' fees, reasonable pre-award expenses of the arbitration, including arbitrators' fees, administrative fees, travel expenses, out-of-pocket expenses (such as copying and telephone), court costs, witness fees, and expert costs and fees. In the absence of a determination of a prevailing party in the award, the parties shall pay their own fees, costs, and expenses of the arbitration. The decision and award of the arbitrator(s) shall be accompanied by a reasoned opinion. Notwithstanding any contrary language in the contract documents, the parties hereby agree that (i) the final arbitration award may be appealed pursuant to the AAA's Optional AppellateArbitration Rules ("Appellate Rules"); (ii) the Underlying Award rendered by the arbitrator(s) shall, at a minimum, be a reasoned award; (iii) the final arbitration award shall not be considered final until after the time for filing the notice of appeal pursuant to the Appellate Rules has expired.Appeals must be initiated within thirty (30) days of receipt of an Underlying Award, as defined byRule A-3 of the AAA's Appellate Rules, by filing a notice of appeal with the AAA office. Following the appeal process conducted pursuant to the Appellate Rules, the decision rendered bythe appeal tribunal may be entered in any federal or state court in Atlanta, Georgia.

4850-6153-1120v5
2954235-000001 07/23/2021

[The remainder of this page intentionally left blank]

**THIS JOINT OWNERSHIP AGREEMENT IS DULY EXECUTED** and delivered by the undersigned Owners, effective as of July 30, 2021.

IFLYAJET, INC.

By: _____ *Bob Brown*
Name: Robert B. Brown
Title: President
Address: 510 Briscoe Blvd, Lawrenceville, GA 30046
Email: bob@iflyajet.com

Templum Consulting, LLC
By: _____ *DM*
Name: Darrell Mays
Title: Member
Address: _____
Email: dm@syamarat.com

PTSC, LLC
By: _____ *Peter Pierce*
Name: Peter Pierce
Title: Member
Address: _____
Email: ppierce@pioneercapital.com

3450 AIP, LLC
By: _____ *Lorne Tritt*
Name: Lorne Tritt
Title: Member
Address: 26 Barbara Lane, Atlanta GA 30327
Email: lorne.tritt@aspglobal.com

OPTICAL AIR DATA SYSTEMS, LLC
By: _____ *P Rogers*
Name: Phil Rogers
Title: President
Address: 10781 James Payne Court, Manassas, VA 20110
Email: progers@oads.com

11