DocuSign Envelope ID: 4C8B9344-4791-4C7A-A6F0-7FF7A9B87B9D
Case 1:23-cv-01383-RTG-JFA  Document 1-4  Filed 10/11/23  Page 1 of 13 PageID# 38

EXHIBIT D

# AIRCRAFT MANAGEMENT AGREEMENT
## (WITH FLIGHT CREW)

THIS **AIRCRAFT MANAGEMENT AGREEMENT** (the "Agreement") is entered into and effective as of July ___, 2021 (the "Effective Date"), by and between Templum Consulting, LLC, a Georgia limited liability company ("Templum"), PTSC, LLC, a Delaware limited liability company ("PTSC"), 3450 AIP, LLC, a Georgia limited liability company ("AIP"), OADS, a Virginia limited liability company ("OADS"),and IFLYAJET, Inc., a Georgia corporation ("IFLYAJET"). IFLYAJET, Templum, OADS, PTSC and AIP are sometimes collectively referred to herein as "Owners.".

## WITNESSETH:

**WHEREAS**, IFLYAJET, Inc owns 1%, Templum owns 24.75%, OADS owns 24.75%, PTSC owns 24.75% and AIP owns 24.75% as joint registered owners of, and each operates in the conduct of its day to day business, a certain Gulfstream aircraft, bearing manufacturer's serial number 1025 and U.S. Registration Number N250KC, which is equipped with two (2) Rolls Royce Tay aircraft engines bearing manufacturer's serial numbers 16141 and 16142, and all parts, components, instruments, avionics, accessories attached thereto or installed thereon, as well as all logbooks, maintenance and overhaul records pertaining to same (collectively the "Aircraft");

**WHEREAS**, IFLYAJET, Inc. is experienced in the operation, management, and administrative coordination of the Aircraft's type; and

**WHEREAS**, Owners desire the services of an aircraft manager to service, maintain and operate the Aircraft for the purpose of transporting the Owners' respective personnel.

**NOW THEREFORE**, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**SECTION 1    TERM AND TERMINATION**

(a)    This Agreement will become effective and will bind the parties to its terms and conditions on the Effective Date, and will remain in full force and effect for one (1) year ( the "Initial Term") and automatically renew for successive one (1) year terms, each a Term.

(b)    IFLYAJET, Inc. may terminate this Agreement at any time by providing thirty (30) days written notice to the Owners, and the Owners may terminate this Agreement with unanimous consent of all Owners, by providing thirty (30) days written notice to IFLYAJET, Inc. and the other Owners.

(c)    Owners may collectively, but not individually, have the right to terminate this Agreement immediately by written notice to IFLYAJET, Inc. following a material breach or Event of Default of this Agreement by IFLYAJET, Inc., the default remaining uncured for fifteen (15) days after written notice to the other party.

(d)    This Agreement shall automatically terminate (i) in the event that the Aircraft is destroyed or becomes an actual or constructive total loss from any cause, or (ii) in the event that the Owners collectively sell all of their ownership interests in the Aircraft to a third party.

*Aircraft Management Agreement*

**SECTION 2**   **DEDICATED FLIGHT CREW AND GROUND CREW**

(a) IFLYAJET, Inc. agrees to furnish to Owners (i) all necessary pilots, cabin attendants, and other flight personnel (the "Flight Crew") for conducting flights on behalf of each Owner and all necessary mechanics and other ground personnel to support the operation of the Aircraft by Owners (the "Ground Crew"). The Flight Crew pilots shall consist of only pilots who are qualified to fly the Aircraft as defined in Part 61 of the Federal Aviation Regulations ("FARs"), have satisfactorily completed the Aircraft manufacturer's approved ground and flight training course for the Aircraft, who meet the pilot requirements under the insurance policies maintained with respect to the Aircraft, and, for any particular flight during the term of this Agreement, who have not reached IFLYAJET's published crew duty limits for the applicable time period, if any.

(b) Each member of the Flight Crew and the Ground Crew will either be contract pilots arranged for by IFLYAJET, Inc., or if applicable will be carried on the payroll of IFLYAJET, Inc. or it's subsidiaries, as long as such crewmember meets the employment requirements of IFLYAJET, Inc. and the terms and conditions of his or her employment letter from IFLYAJET, Inc. IFLYAJET, Inc. shall have sole responsibility to:

   i. Pay all personnel wages and benefits;

   ii. Make all proper payroll deductions as applicable, including income tax and social security deductions, required under state and federal laws to be made from the compensation paid to said personnel;

   iii. Pay all payroll and employment taxes as may be applicable, and any other payments as necessary to any governmental agency required to be made with respect to the wages and benefits paid to said personnel;

   iv. If applicable, maintain at all times at its sole cost and expense Workers Compensation Insurance and Employer's Liability coverage with limits no less than those statutorily required.

   v. IFLYAJET, Inc. shall indemnify and hold harmless Owners and their respective owners, members, shareholders, managers, directors, officers, employees, and successors and assigns from and against all claims, liability, damage, loss or expense, including reasonable attorneys' fees and defense costs, resulting from employment related claims by the personnel employed or contracted for by IFLYAJET, Inc., except those claims caused by any acts or omissions of an Owner or any of their respective owners, shareholders, members, officers, employees, invitees or representatives. This indemnity obligation of IFLYAJET, Inc. shall survive the termination or expiration of this Agreement, in perpetuity.

(c) IFLYAJET, Inc. may terminate the employment or contractual arrangement of any such Flight or Ground Crew member at any time in its sole discretion

(d) For each Flight Crew and Ground Crew member, and to the extent required under the FARs, IFLYAJET, Inc. shall provide or arrange for initial and recurrent training and, in the case of pilots, all required certifications. Owners shall provide IFLYAJET, Inc. with reasonable access to and use of the Aircraft for the purpose of conducting all training and testing that is necessary (i) for compliance with the FARs or IFLYAJET's policies and procedures or (ii) to promote the safe operation of the Aircraft (including, without limitation, observation of line operation by IFLYAJET,

*Aircraft Management Agreement*

Inc.'s management, proficiency checks, line checks, and type training and certification). Owners agree to reimburse IFLYAJET, Inc. promptly for all reasonable fees, costs, and expenses relating to training and certification under this Paragraph, including, without limitation, training and testing flights of the Aircraft provided appropriate documentation is provided to substantiate such claims.

**SECTION 3           AIRCRAFT MANAGEMENT SERVICES**

(a)     IFLYAJET, Inc. agrees to provide to Owners during the term of this Agreement a full suite of services, including the following:

   i.    **Hangar, Office, and Shop Facilities**. IFLYAJET, Inc. shall provide for hangar, office, and shop facilities at Gwinnett County Airport and shall base the Aircraft at that location (the "Operating Base") or other locations as determined by IFLYAJET, Inc. and the Owners. As noted herein, the initial Operating Base of the Aircraft shall be Gwinnett County Airport. Cost of such facilities will be included in the Owner's monthly assessment. IFLYAJET, Inc. shall arrange, at the discretion of the Owners, for hangar, office, and/or shop facilities at other locations.

   ii.   **Maintenance**. IFLYAJET, Inc. shall maintain the Aircraft in an airworthy condition and, in connection with the foregoing, shall perform or arrange for line, routine, and non-routine maintenance and overhaul of the Aircraft in compliance with all applicable laws and regulations, the Aircraft's warranties (if any), the Aircraft's operating manual, all applicable maintenance manuals, current manufacturer recommendations, applicable overhaul manuals, applicable "power by the hour" or similar maintenance, service, or component agreements, including addressing of service bulletins, airworthiness directives, and other required repairs or replacements. IFLYAJET, Inc. shall arrange for engine and airframe maintenance service plans in accordance with regulations and manufacturer guidelines. Owners agree to cooperate with IFLYAJET, Inc. in scheduling maintenance of the Aircraft, and IFLYAJET, Inc. shall use its reasonable best efforts to minimize scheduling conflicts with Owners' use of the Aircraft arising from such maintenance. Costs for maintenance will be included in maintenance expenses, engine reserve program and APU allowances on a monthly basis. IFLYAJET, Inc. agrees to consult with Owners and obtain pre-approval on an ongoing basis for any expenses which IFLYAJET, Inc. reasonably expects will be greater than $10,000.00 in each instance.

   iii.  **Fuel and Lubricants**. IFLYAJET, Inc. shall arrange for lubricant services, fueling, and all other consumables of the Aircraft at the Operating Base and, if required, at other locations, and shall use its reasonable best efforts to obtain the most favorable fuel prices. Costs for fuel and lubricants will be paid by each individual owner for their respective flights and will not be paid by IFLYAJET, Inc.

   iv.   **Records and Administration**. IFLYAJET, Inc. shall prepare and discuss with Owners, on a no less than annual basis, an annual estimated budget for the Aircraft and its estimated expenses for the ensuing year. IFLYAJET, Inc. shall also create and maintain operations, maintenance (including all airframe, engine, and avionics logbooks), administrative, and accounting records with respect to the Aircraft and the operations and services under this Agreement in a complete, accurate, and up-to-date manner. In conjunction therewith, IFLYAJET, Inc. will provide to Owners, on a monthly basis (as well as yearly reconciliation report which shall summarize all activities and expenses for the immediately preceding calendar year), the following records and documents:

DocuSign Envelope ID: 1C8B9344-4741-4C7A-A8F0-71F7A9B8759D
Case 1:23-cv-01383-PTG-JFA   Document 1-4   Filed 10/11/23   Page 4 of 13 PageID# 41
EXHIBIT D

*Aircraft Management Agreement*

      (A)    Flight logs for each Aircraft trip made, including flight hours, or any fraction thereof to the nearest 1/10 hour;

      (B)    Fuel purchased;

      (C)    All maintenance, inspections, and repairs performed;

      (D)    All operating costs, whether fixed, direct, or non-recurring with respect to the operation of the Aircraft; and

      (E)    Copies of all invoices, statements, and charge slips relating to the operation or maintenance of the Aircraft to substantiate expenses billed to or paid by Owners.

With the exception of out-of-pocket expenses as discussed in Section 4(b), costs for Records and Administration will be included in the Management Fee. All records pertaining to the performance of IFLYAJET, Inc.'s services hereunder and all books of account and records relating to the Aircraft and its operations shall be open for reasonable inspection and audit from time to time by Owners at IFLYAJET's principal place of business upon not less than three (3) business days' notice throughout the Term of this Agreement and for the period ending one (1) year after the termination hereof. IFLYAJET, Inc. agrees not to remove or destroy such records prior to the time when Owners' right to inspect and audit terminates

    v.    **Minimum Equipment List**. IFLYAJET, Inc. shall obtain the Minimum Equipment List ("MEL") for the Aircraft from the Federal Aviation Administration (the "FAA"). With the exception of out-of-pocket expenses as discussed in Section 4, costs for Minimum Equipment List will be included in the User Fee.

    vi.    **FAA Liaison**. IFLYAJET, Inc. shall serve as Owners' liaison to the FAA for purposes of assisting Owners in complying with the FARs. With the exception of out-of-pocket expenses as discussed in Section 4, costs for FAA Liaison will be included in the Management Fee.

  (b)    **Additional Services**. IFLYAJET, Inc. shall provide and/or arrange for all other services as may be reasonably required or appropriate with respect to the operation and/or management of the Aircraft hereunder, including, without limitation, the following services: using its scheduling and dispatch organization to assist Owners in scheduling the Aircraft, the Flight Crew, and passengers; assisting Owners in developing in-house procedures and providing training to each Owner's personnel, if necessary, to coordinate flight requests; receiving trip requests from Owners and producing a trip sheet for each proposed flight of the Aircraft with pertinent details of the trip itinerary; arranging ground transportation requirements for passengers on the Aircraft; arranging for catering services; arranging for landing permits, clearances, and ground handling for domestic and international destinations; and coordinating the repositioning of the Aircraft to support Owners' flight schedule(s). With the exception of out-of-pocket expenses as discussed in Section 4, costs for the additional services will be included in the Management Fee.

  (c)    **FAR Part 91 Operations**. All flight operations on behalf of any Owner under this Agreement shall be conducted under Part 91 of the "FARs", all in accordance with the MEL for the Aircraft. IFLYAJET, Inc. reserves the right to refuse to operate any flight that it reasonably believes may be a flight for compensation or hire; in which case, IFLYAJET, Inc. will promptly inform Owners of such refusal. OWNERS UNDERSTAND AND AGREE THAT THEY SHALL

*Aircraft Management Agreement*

NOT PROVIDE, OFFER TO PROVIDE, OR IN ANY WAY HOLD THEMSELVES OR THE AIRCRAFT OUT OR MARKET TO ANY PARTY AS PROVIDING AIR TRANSPORTATION FOR COMPENSATION OR HIRE, PROVIDED, HOWEVER, THAT THIS SHALL NOT PROHIBIT OWNERS FROM OPERATING THE AIRCRAFT FOR ANY REASON ALLOWED UNDER FAR 91.501.

(d) **FAR Part 135 Operations Prohibited**. Flight operations under Part 135 of the FARs or any flight that constitutes the provision of air transportation for compensation or hire shall be strictly prohibited under this Agreement.

**SECTION 4**      **COMPENSATION FROM OWNERS; ESCROW**

(a) **Fees and Flight Hour Assessments**. For performance of IFLYAJET, Inc.'s services under this Agreement, Owners shall be obligated to pay IFLYAJET, Inc. a monthly Management Fee, which shall be equal to IFLYAJET, Inc.'s out of pocket costs for wages, salaries, benefits, travel expenses/per diem, and other expenses for the Flight Crew for Owner trips, including if applicable the pro rata costs of workers compensation insurance premiums for the Flight Crew. In addition, each Owner will be assessed a Fifteen Hundred Dollar ($1500.00) per hour charge for all flight hours flown by that Owner on a per trip basis (the "Flight Hour Charges"). For clarification and avoidance of doubt, the Flight Hour Charges will not constitute a fee owed to IFLYAJET, Inc. but, rather, will be a charge to each Owner, out of their respective portions of the Owners Escrow Account (as defined in Section 4(a) hereof)) against which each Owner's other expenses due hereunder will be applied. Last, Owners shall pay a "Management Fee" in the aggregate amount of Three Thousand Dollars ($3000.00) per month to compensate IFLYAJET, Inc. for its management and administrative services relative to the Aircraft.

(b) Out-of-Pocket Costs. In addition to the fees and assessments set forth in Section 4(a), above, Owners shall pay to IFLYAJET, Inc., on a monthly basis, full reimbursement for all reasonably and properly incurred and documented out-of-pocket costs and expenses associated with any flight or service rendered by IFLYAJET, Inc. under this Agreement as provided in Section 3(a), including, without limitation, the following: Aircraft consumables; initial, replacement, and consumable parts (including, without limitation, shipping costs and core charges for parts and components); maintenance ground support equipment; Aircraft flight crew and flight support labor costs and expenses except for services provided by the dedicated Flight Crew; Aircraft maintenance and ground crew labor costs and expenses, third-party service fees for technical support of the Aircraft; travel expenses of IFLYAJET, Inc.'s supervisory personnel incurred in connection with supporting the operation of the Aircraft; catering; in-flight entertainment materials; ground transportation; expenses (e.g., airport, landing, ramp, handling, customs, airway, overflight, tie down, and hangaring); publications (e.g., navigation, operations, and maintenance); communications charges; computer services; substitute or supplementary personnel (day rate); alcohol and drug testing to the extent required by the FAA; and aviation charts and manuals; all billed at cost (including any applicable taxes or similar charges) with pass-through of any discounts obtained by IFLYAJET, Inc. in connection with such out-of-pocket costs.

(c) **Billings to Owners; Payment to IFLYAJET, Inc.** IFLYAJET, Inc. shall prepare and present to Owners a Monthly Summary Report, which report shall provide to Owners, with such reasonable detail and such reasonably requested backup documentation as Owners shall request from time to time, all expenses incurred by IFLYAJET, Inc. for the Aircraft for the immediately preceding month (including but not limited to the Management Fees for each Owner, the monthly Flight Crew Fee, and any other costs and expenses for which Owners are liable

DocuSign Envelope ID: 1C8B9344-4741-4C7A-A8F0-71F7A9B6799D
Case 1:23-cv-01383-PTG-JFA Document 1-4 Filed 10/11/23 Page 6 of 13 PageID# 43
EXHIBIT D

*Aircraft Management Agreement*

hereunder). The Monthly Summary Report shall apportion all fixed costs for the Aircraft (including Flight and Ground Crew, hangar (if applicable), insurance (if applicable), other fixed costs and all maintenance, repair, overhaul and inspection costs, in proportion to each Owner. Any other flight-specific variable costs, such as the engine maintenance plan, ramp fees, landing fees, catering, crew travel expenses and the like, shall be charged to each Owner as incurred by IFLYAJET, Inc. for each Owner for the previous month.

(d) **Compensation Adjustments**. Owners understand and agree that IFLYAJET, Inc. shall have the right to request, negotiate and implement a change in the amount of the Flight Crew Fee: (i) upon thirty (30) days prior written notice to Owners during the Term or (ii) prior to the start of each renewal Term, to reflect changes in Flight Crew expenses and employee benefits and other economic conditions. IFLYAJET, Inc. may not request an increase in the amount of the Flight Crew Fee more than one time during each Term.

(e) **Taxes.** IFLYAJET, Inc. expressly acknowledges and accepts that Owners shall exclusively use and operate the Aircraft under FAR Part 91 and shall exercise Operational Control for FAA purposes, and that Owners shall, as applicable for each of their individual flights, have and retain at all times during the term of this Agreement the exclusive possession, command, and control of the Aircraft for purposes of Internal Revenue Code Section 4261, and the Regulations and rulings promulgated thereunder. The parties understand and agree that the support services provided in connection with this Agreement shall not constitute commercial transportation subject to the Federal Transportation Excise Taxes (FETs). In furtherance thereof, Owners agrees that they are solely responsible for remitting to IFLYAJET, Inc. or otherwise directly paying to the Internal Revenue Service (IRS), any and all FETs, if applicable, pertaining to the support services, or any other services, or the services fees or any other fees and expenses, paid by Owners to IFLYAJET, Inc. or paid by Owners to any third party vendor directly, or otherwise paid pursuant to the terms of this Agreement. IFLYAJET, Inc. shall provide Owners with prompt written notice upon IFLYAJET, Inc. being provided with written notice from IRS that Owners have any potential FET obligation. Owners understand and agree that any determination (by IFLYAJET, Inc., Owners or the IRS) concerning applicability of FETs may be made during the term of this Agreement, or subsequent to the termination hereof, and during any applicable statute of limitations period (as such period may be extended, if applicable).

**SECTION 5**     **OPERATIONAL CONTROL**

(a) For all flights on behalf of Owners under this Agreement, it is hereby agreed and acknowledged between the Owners and IFLYAJET, Inc. that during all phases of flights conducted under this Agreement, each Owner shall, as applicable, retain and have (i) operational control of the Aircraft and (ii) possession, command, and control of the Aircraft. Each Owner further acknowledges operational control for its own flights (and not any flights by the other Owner) by exercising its authority over initiating, conducting, or terminating any such flight. In accordance with Part 91 of the FARs, the Flight Crew is under the exclusive command and control of each individual Owner in all phases of those flights and at all times.

(b) Notwithstanding that operational control for all phases of flights conducted on behalf of an Owner under this Agreement remains and lies with the applicable Owner, Owners and IFLYAJET, Inc. hereby expressly agree that the Pilot in Command, as determined by reference to the FARs, in his or her sole discretion, may terminate any flight, refuse to commence any flight, or take any other flight-related action which, in the judgment of the Pilot in Command, is necessitated by considerations of safety. The Pilot in Command shall have final and complete

*Aircraft Management Agreement*

authority to postpone or cancel any flight for any reason or condition which, in his or her judgment, would compromise the safety of the flight. No such action of the Pilot in Command shall create or support any liability for loss, injury, damage, or delay between Owners and IFLYAJET, Inc.

**SECTION 6         INSURANCE**

(a)     Owners, prior to the commencement of this Agreement, shall cause the Aircraft to be insured under a policy(ies) of insurance maintained by Owners at Owners' expense as set forth below. With respect to the Aircraft, Owners shall provide the following minimum coverages:

i.      "All risk," ground and flight hull insurance on the Aircraft in an amount not less than $3,000,000. Such policy shall provide that the proceeds of such insurance shall be paid solely to the Owners.

ii.     Public aircraft liability insurance of at least Twenty Million Dollars ($20,000,000.00) combined single limit bodily injury (including passengers) and property damage liability insurance. IFLYAJET, Inc., Owners and their respective owners, members, shareholders, directors, officers, employees, affiliates, successors, and assigns shall be designated additional insureds, as applicable.

(b)     **Other Insurance.** IFLYAJET, Inc. shall, at its own expense, procure and thereafter keep in effect during the Term hereof:

i.      Workers' Compensation Insurance for its employees, including all Flight Crew and Ground Crew as applicable, sufficient to comply fully with requirements and coverages specified by laws of each jurisdiction in which the Aircraft may be operated;

ii.     Comprehensive General Liability Insurance providing limits of not less than One Million Dollars ($1,000,000.00) combined single limit per occurrence for bodily injury and death and for property damage and including coverage for Contractual Liability and Products-Completed Operations. Standard exclusions for aviation operations shall be permissible;

iii.    Comprehensive Liability Insurance (including owned, non-owned and hired vehicles), providing limits of not less than Five Hundred Thousand Dollars ($500,000.00) combined single limit per occurrence for bodily injury and death and including property damage; and

v.      IFLYAJET, Inc. will provide Owners with certificate(s) of insurance issued by its insurance carrier evidencing the insurance required hereunder upon execution of this Agreement, and at any time thereafter as Owners may reasonably request. Full and complete copies of all policies shall also be provided to Owners upon request.

(c)     All insurance to be provided by Owners or IFLYAJET, Inc. hereunder shall be primary and be in a form and substance and with insurers reasonably satisfactory to Owners or IFLYAJET, Inc. as applicable, and shall name IFLYAJET, Inc. or Owners, as applicable, as a primary additional insured. All policies shall contain a waiver of subrogation endorsement and breach of warranty coverage. Each insurance policy required under this subsection (c) shall insure the interests of IFLYAJET, Inc. or the Owners, as applicable, regardless of any breach or violation by the named insured of any warranties, declarations or conditions contained in such policies. Each such policy shall be primary without any right of contribution from any insurance maintained by IFLYAJET, Inc. or Owners, as applicable, and shall provide for at least thirty (30)

*Aircraft Management Agreement*

days prior written notice of material change, cancellation, lapse, alteration or termination of any coverage.

(d) **Lack of Insurance.** The Aircraft shall not be operated by either IFLYAJET, Inc. or Owners during any period or in any area when the insurance to be carried under this Agreement as described in this Section 7 is not in full force and effect, nor shall the use or operation of the Aircraft be conducted in such location or manner as shall cause any insurance required to be maintained or carried as required in this Agreement to be suspended, impaired or canceled or the protection thereunder to be jeopardized.

(e) **Cost of Insurance.** Owners and IFLYAJET, Inc. as applicable, shall be billed directly from the insurance broker and will pay the premiums with respect to the coverages to be provided by them hereunder.

(f) **Cooperation.** Both Owners and IFLYAJET, Inc. shall cooperate with each other and shall perform any acts necessary so as to insure compliance by Owners and IFLYAJET, Inc. with all of the terms, covenants, changes to and conditions of the insurance policies described in this section.

## SECTION 7   NOTICES

All communications, declarations, demands, consents, directions, objections, approvals instructions, requests and notices required or permitted by this Agreement shall be in writing and shall be deemed to have been duly given or made when delivered by electronic mail, by hand, or five Business Days after being sent by registered mail, return receipt requested, postage prepaid, or on the next business day when sent by overnight courier or when transmitted by means of facsimile or other wire transmission (with request for assurance of receipt in a manner typical with respect to communications of that type and followed promptly with the original thereof) in each case at the address set forth below:

**To IFLYAJET, Inc.**
Attn: Robert Brown
Email: bob@iflyajet.com

**To Templum Consulting, LLC**
Attn: Darrell Mays
Email: dm@syamarat.com

**To OADS, LLC**
Attn: Phil Rogers
Email: progers@oads.com

**To PTSC, LLC**
Attn: Peter Pierce
Email: ppierce@pioneercapital.com

**To 3450 AIP, LLC**
Attn: Lorne Tritt
Email: lorne.tritt@aspglobal.com

*Aircraft Management Agreement*

**SECTION 8**     **LIENS**

IFLYAJET, Inc. will ensure that no liens are created or placed against the Aircraft by third parties as a result of IFLYAJET, Inc.'s actions during the term of this Agreement, except for mechanic's liens to be discharged by IFLYAJET, Inc. in full and in the normal course of business. Owners shall retain the unilateral right to attach any lien or mortgage or to the Aircraft at any time and in their discretion and, provided that Owners provide notice of same and any pertinent details to IFLYAJET, Inc. IFLYAJET, Inc. covenants that it will at all times hereunder manage and maintain the Aircraft in full compliance with the requirements and covenants of any Owner-imposed lien. This Agreement is and at all times shall remain subordinate in all respects to any Owner-imposed liens granted to any lender or financing company pursuant to any mortgage granted by Owners encumbering the Aircraft. If applicable, the lender shall have the right at all times notwithstanding this Agreement to enforce the terms and provisions of the mortgage, including, without limitation, repossession of the Aircraft, at which time this Agreement shall automatically terminate.

**SECTION 9**     **INDEMNIFICATION**

(a)     Owners jointly and severally agree to indemnify and hold harmless IFLYAJET, Inc. its members, owners, officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporation, successors and assigns (the "Indemnified Parties") from and against any loss, liability, claim, damage, fine, penalty, taxes and expense (including, but not limited to, costs of investigation, defense and reasonable fees incurred for attorneys, expert witnesses, consultants, or litigation support) or diminution in value (each an "Indemnified Loss") which solely arises from or solely caused by any actions or omissions to act by Owners as may be contemplated in connection with the management of the Aircraft as provided under this Agreement. Notwithstanding this indemnity obligation, nothing in this Agreement shall be construed so as to provide an indemnity obligation on behalf of Owners for any Indemnified Loss to the extent that said Indemnified Loss is caused by IFLYAJET, Inc.'s (i) negligence; (ii) gross negligence; (iii) acts or omissions in breach of this Agreement; or (iii) willful misconduct.

(b)     IFLYAJET, Inc. agrees to indemnify and hold harmless Owners and their respective members, owners, shareholders, officers, directors, employees, agents, affiliates, representatives, subsidiaries, parent corporation, successors and assigns (the "Indemnified Parties") from and against any loss, liability, claim, damage, fine, penalty, taxes and expense (including, but not limited to, costs of investigation, defense and reasonable fees incurred for attorneys, expert witnesses, consultants, or litigation support) or diminution in value (each an "Indemnified Loss") which solely arises from or solely caused by any action or omission to act of IFLYAJET, Inc. as is contemplated under this Agreement. Notwithstanding this indemnity obligation, nothing in this Agreement shall be construed so as to provide an indemnity obligation on behalf of IFLYAJET, Inc. for any Indemnified Loss to the extent that said Indemnified Loss is caused by an Owner's (i) negligence; (ii) gross negligence; (iii) acts or omissions in breach of this Agreement; or (iii) willful misconduct.

(c)     Notwithstanding the language in (a) and (b), above, IFLYAJET, Inc. and Owners expressly waive and release each other and their affiliates, owners, members, shareholders, officers, agents, employees, successors and assigns from any and all liability arising from or related to any and all Indemnified Losses to the extent that any Indemnified Loss is covered by the insurance policies and coverages required to be provided by IFLYAJET, Inc. and/or Owners hereunder. If and to the extent that any Indemnified Loss against Owners falls outside of the

*Aircraft Management Agreement*

waiver provisions immediately above (e.g., a lien claim against the Aircraft or an FAA fine or penalty caused by the action of IFLYAJET, or an Indemnified Loss which is denied or rejected by the carrier due to any act or omission of IFLYAJET, Inc.), IFLYAJET, Inc. shall defend, indemnify and hold harmless Owners as provided in (b), above. Likewise, and if and to the extent that an Indemnified Loss against IFLYAJET, Inc. falls outside of the waiver provisions immediately above, Owners shall defend, indemnify and hold harmless IFLYAJET, Inc. as provided in (a), above. No party shall be liable to the other parties, under any circumstance or theory of recovery, for any incidental, consequential, punitive, or exemplary damages of any kind or character, all of which are expressly waived.

(d) IN NO EVENT SHALL ANY PARTY BE LIABLE FOR OR HAVE ANY DUTY FOR INDEMNIFICATION OR CONTRIBUTION TO THE OTHER PARTIES FOR ANY CLAIMED INDIRECT, SPECIAL, CONSEQUENTIAL, OR PUNITIVE DAMAGES, OR FOR ANY DAMAGES CONSISTING OF DAMAGES FOR LOSS OF USE OR DEPRECIATION OF VALUE OF THE AIRCRAFT, OR LOSS OF PROFIT.

**SECTION 10      EVENTS OF DEFAULT**

(a) **Events of Default.** If a party hereto:

i. Fails to make any payment required to be made under the terms of this Agreement on or prior to the date any such payment shall become due and payable;

ii. Fails to comply with federal, state and local laws or regulations applicable to the Aircraft or its passengers;

iii. Operates the Aircraft in violation of any insurance policies or during any period when the insurance required by Section 7 hereof shall not be in full force and effect;

iv. Fails to perform any of the other terms, covenants or conditions contained in this Agreement required to be performed; or

v. Becomes insolvent or bankrupt or makes an assignment for the benefit of creditors; then

(b) Collectively, the above items shall constitute an "Event of Default" and the other party may then, at its option, take any or all actions available at law or equity or under this Agreement.

(c) **Curing an Event of Default.** If any one or more of said Events of Default by IFLYAJET, Inc. or Owners shall occur and be continuing, the other parties may:

i. Give notice pursuant to Section 8 hereof to the party in default specifying such Event of Default and stating that this Agreement may be terminated on a specified date, no less than fifteen (15) days after the date of giving of such notice at the option of the non-defaulting party, unless such Event of Default is cured by such date;

*Aircraft Management Agreement*

**SECTION 11**  **CONFIDENTIALITY**

Neither Owners nor IFLYAJET, Inc. shall disclose to any third party (other than its respective owners, members, shareholders, managers, officers, directors, employees, agents and financial and legal advisors) any confidential business information concerning the other derived in connection with this Agreement, including the terms of the Agreement, financial matters relating thereto, and the parties' business operations thereunder, and including, with respect to Owners, their trade secrets and information and items pertaining to schedules, arrangements, travels, business and activities relating to Owners, their related parties, guests, managers, directors and officers; except: (i) to the extent necessary to comply with applicable laws and regulations, or by legal process including the valid order of a court of competent jurisdiction, in which event the party making such disclosure shall so notify the other as promptly as practicable (and, if possible, prior to making such disclosure) and shall seek confidential treatment of such information; (ii) as part of its reporting or review procedure to its auditors, its attorneys, and financial consultants and advisors; (iii) in order to enforce its rights pursuant to this Agreement; and (iv) if it is mutually agreed by Owners and IFLYAJET, Inc. in writing. Each party acknowledges that the other will be irreparably damaged and harmed should the breaching party use such confidential information for its own unauthorized purposes and that the aggrieved party may seek all appropriate actions and remedies in law and in equity, including injunctive relief.

**SECTION 13**  **OBLIGATIONS ON TERMINATION/EXPIRATION**

In the event that this Agreement is terminated or expires for any reason, and in addition to any other rights or obligations to the Owners which IFLYAJET, Inc. may have hereunder, IFLYAJET, Inc. shall return promptly upon the termination/expiration of this Agreement, or otherwise upon the request of Owners at any time, all logbooks, manuals, records and related maintenance and flight logs pertaining to the operation of the Aircraft and any Owners materials, data and documents containing confidential information of Owners that may be in IFLYAJET, Inc.'s possession. In addition, IFLYAJET, Inc. shall reconcile the balance of the Owner's Funds as of the date of termination/expiration as against any expenses for the Aircraft that are properly chargeable to the Owners hereunder, and shall present a final report to the Owners within 30 calendar days of the termination/expiration date showing the final balance due and the amounts to be deducted from each Owner's Funds balance. All accounts and charges shall then be paid and closed, and the balance, if any, of each Owners Funds shall be returned to each Owner.

**SECTION 14**  **MISCELLANEOUS**

(a) **Choice of Law.** This Agreement has been negotiated and delivered in the State of Georgia and shall in all respects be governed by, and construed in accordance with, the law of the State of Georgia including all matters of construction, validity and performance, without giving effect to its conflict of laws provisions. All parties agree to submit to the exclusive jurisdiction of the courts in Georgia.

(b) **Force Majeure.** With the exception of payment obligations and any obligations to provide insurance, both of which shall be unconditional, no party to this Agreement shall be deemed to be in breach of this Agreement or its obligations hereunder or have any liability of any kind or nature whatsoever for any delay, cancellation, or damage arising in whole or in part from any act of God, act of nature, acts of civil or military authority, epidemic, pandemic, unforeseeable strike or labor dispute, inability, after due and timely diligence, to provide equipment, materials, systems, accessories or parts, or for any unforeseeable cause beyond the control of such party.

Case 1:23-cv-01383-PTG-JFA Document 1-4 Filed 10/11/23 Page 12 of 13 PageID# 49
DocuSign Envelope ID: 1C8B9344-4741-4C7A-A8F0-71F7A9B6759B

EXHIBIT D

*Aircraft Management Agreement*

(c)     **Entire Agreement.** This Agreement, and all terms, conditions, warranties, and representations herein, are for the sole and exclusive benefit of the signatories hereto. This Agreement constitutes the entire agreement of the parties as of its Effective Date and supersedes all prior or independent, oral or written agreements, understandings, statements, representations, commitments, promises, and warranties made with respect to the subject matter of this Agreement.

(d)     **Other Transactions.** Except as specifically provided in this Agreement, none of the provisions of this Agreement, nor any oral or written statements, representations, commitments, promises, or warranties made with respect to the subject matter of this Agreement shall be construed or relied upon by any party as the basis of, consideration for, or inducement to engage in, any separate agreement, transaction or commitment for any purpose whatsoever.

(e)     **Prohibited and Unenforceable Provisions.** Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibitions or unenforceability in any jurisdiction. To the extent permitted by applicable law, each of Owners and IFLYAJET, Inc. hereby waives any provision of applicable law which renders any provision hereof prohibited or unenforceable in any respect.

(f)     **Independent Contractor Agreement.** This Agreement shall constitute an independent contractor agreement, and nothing in this Agreement shall be deemed, construed, or interpreted as (i) conveying to IFLYAJET, Inc. any additional right, title, or interest in the Aircraft (and IFLYAJET, Inc. expressly and irrevocably waives any right or claim related thereto, including but not limited to any common law, judicial, or statutory lien claims of any kind or nature), (ii) creating in any way any association, partnership, joint venture, or principal and agent relationship between the parties.

(g)     **Assignment.** No party shall, without the prior written consent of the other parties, assign, transfer, charge, mortgage, subcontract, or deal in any other manner with all or any of its rights or obligations under this Agreement.

(h)     **Enforcement.** This Agreement, including all agreements, covenants, representations and warranties, shall be binding upon and inure to the benefit of, and may be enforced by Owners, IFLYAJET, Inc. and each of their agents, servants, personal representatives, successors and permitted assignees.

(i)     **Headings.** The section and subsection headings in this Agreement are for convenience of reference only and shall not modify, define, expand, or limit any of the terms or provisions hereof.

(j)     **Counterparts.** This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

(k)     **Modification.** No term or provision of this Agreement may be changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the party against which the enforcement of the change, waiver, discharge, or termination is sought.

(l)     **No Waiver.** No delay or omission in the exercise or enforcement or any right or remedy hereunder by a party shall be construed as a waiver of such right or remedy. All remedies,

rights, undertakings, obligations, and agreements contained herein shall be cumulative and not mutually exclusive, and in addition to all other rights and remedies which a party possesses at law or in equity.

**IN WITNESS HEREOF**, the undersigned have executed this Aircraft Management Agreement as of the Effective Date.

**MANAGER:**

IFLYAJET, Inc.

*Bob Brown*
DocuSigned by: 29C8CD6DC32A479...

**OWNERS:**

IFLYAJET, Inc.

*Bob Brown*
DocuSigned by: 29C8CD6DC32A479...

Templum Consulting, LLC

*DJM*
DocuSigned by: 1033469FE60E4B4...

PTSC, LLC

*Peter Pierce*
DocuSigned by: 070A576B119741D...

OADS, LL

*PL Rogen*
DocuSigned by: FACF2B2CF9A4404...

3450 AIP, LLC

*Lorne Tritt*
DocuSigned by: 352CF7BDA8844E0...